UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

CHRISTOPHER BROWN,

Plaintiff,

v.

NEVADA DEPARTMENT OF CORRECTIONS, et al,

Defendants.

Case No. 3:24-cv-00212-ART-CLB

ORDER ON REPORT AND RECOMMENDATION (ECF No. 46)

Plaintiff Christoper Brown ("Brown") is an inmate in the custody of the Nevada Department of Corrections ("NDOC") who was housed at Ely State Prison ("ESP") and High Desert State Prison ("HDSP") during the actionable period in this case. (ECF No. 35-1.) Brown filed a civil rights complaint under 42 U.S.C. § 1983 alleging Defendant Salisheaun Garcia ("Garcia") refused his request for immediate medical treatment, which resulted in him developing a severe infection that required him to be hospitalized and undergo two surgeries. (ECF No. 11 at 7-8.) Before the Court is Garcia's Motion for Summary Judgment (ECF No. 35.) Also before the Court is Magistrate Judge Carla Baldwin's report and recommendation recommending that the Motion for Summary Judgment be denied. (ECF No. 46.)

## I. Factual and Procedural Background

The following relevant facts are adopted from the R&R. (ECF No. 46 at 2-6.)

On September 10, 2023, Brown stopped Garcia to show her his hand because it was swollen. (ECF No. 35 at 2; 37-1 at 14; 41 at 2.) Brown's medical records state his hand was swollen but that there was no drainage, redness, or heat noted. (ECF No. 37-1 at 14.) Brown, however, describes that his hand was

"swollen the size of an inflated latex glove and oozing out pus from a cut on [his] middle finger knuckle." (ECF No. 41 at 2.) Brown further states he had seen Garcia the day before and showed her his hand, and she told him "[t]he swelling should go down and stop oozing pus in a couple days," (*id.*), though his medical records do not reflect this, and Garcia does not mention seeing Brown prior to September 10.

Rather, Brown's medical records state that on September 10 Brown told Garcia he had punched a wall three days prior and was self-treating with a triple antibiotic and ibuprofen because he did not want to see a doctor. (ECF No. 37-1 at 14.) Garcia told Brown to submit a kite detailing all the issues with his hand, which he agreed to do, and Garcia informed the oncoming shift so Brown could be scheduled with a provider. (*Id.*) Brown does not dispute this, but notes Garcia told him to take Ibuprofen for the pain, which he did. (ECF No. 41 at 2.)

The following day, on September 11, Brown states he stopped Garcia again and requested a man down because he was in such extreme pain he could not eat or sleep. (*Id.*) According to Brown, Garcia refused his man down request and instead offered him an ice pack. (*Id.*) Brown told Garcia an ice pack would not help and demanded to see a doctor. (*Id.*) Garcia told Brown he "wasn't seeing a doctor" and walked away. (*Id.*) Brown's medical records reflect a different version of events. Per the records, Garcia advised Brown he was scheduled to see a doctor the following day and offered him an ice pack to help with the swelling in the meantime. (ECF No. 37-1.) Brown then proceeded to "capture" his food slot and demanded to see a doctor that day. (*Id.*) Garcia states she felt threatened by Brown's behavior and walked away. (*Id.*)

Brown admits he captured his food slot but states it was after Garcia walked away. (ECF No. 41 at 3.) Brown further states he told his unit officer he wanted to speak with a sergeant because he was in extreme pain and needed immediate medical care. (*Id.*) A sergeant came to see Brown and "informed [him]

that because of [his] actions [he] would be seeing a doctor the next day." (*Id.*) Brown also states he filed an emergency grievance over Garcia's denial of his man down request, (*id.*), though no such grievance appears in the record.

Dr. Marks saw Brown the following day on September 12 and diagnosed him with an infection in his left hand. (ECF Nos. 35 at 2; 37-1 at 14; 41 at 3.) Brown states Dr. Marks prescribed him medication he thought would help and told him to wait three days before returning. (ECF No. 41 at 3.) Brown's medical notes, however, state Brown admitted at Dr. Marks's urging that he had not actually punched a wall but had received a "fight bite." (ECF No. 37-1 at 8.) Dr. Marks gave Brown an injection of the antibiotic Rocephin, and ordered he receive an additional shot per day for two days. (ECF No. 37-1 at 6.) Dr. Marks also prescribed Brown Ibuprofen, Augmentin (another antibiotic), and ace wrap. (*Id.*) Dr. Marks ordered the wound be rechecked in three to four days and that he be called with a status report. (*Id.*) Brown states that after this day he never saw Garcia again.

The following day, on September 13, Brown states a different nurse came to check on him and when she saw his hand she told him he "shouldn't still be here at the prison, that [he] needed to get 'flight for lifed to a hospital as soon as possible.'" (ECF No. 41 at 3.) Garcia, on the other hand, states she went to check on Brown and noticed his hand had doubled in size and was oozing dark yellow and green pus. (ECF No. 37-1 at 13.) Garcia noted Brown could "hardly make a fist," that his hand was "soft [and] tender to [the] touch," and that there was "increased warmth." (*Id.*) Garcia contacted the on-call provider who "stated he wanted to wait another day for [the] antibiotics to kick in, [and] he would make arrangements to wash out [Brown's] hand." (*Id.*)

The next day, on September 14, Dr. Marks ordered Brown transported to the local emergency room for "possible osteomyelitis." (ECF No. 35 at 3; 35-2 at 3; 37-1 at 6; 41 at 3.) However, Brown's infection was beyond the emergency

room's capabilities, so he was flown to a hospital in Las Vegas. (ECF No. 35-2 at 2-3; 41 at 3-4.) Brown was hospitalized for approximately five weeks and underwent two surgeries. (ECF Nos. 35-2 at 2; 41 at 3-4.) Brown returned to HDSP on October 20 where he received follow-up care until his transfer back to ESP on December 13. (ECF Nos. 35-2 at 2; 37-1 at 3-4, 12.)

On December 10, just before his transfer back to ESP, Brown filed Informal Grievance # 2006-31-61025. (ECF No. 35-3 at 2.) Brown stated he requested a man down on September 11 because his hand was swollen and oozing pus, but Garcia denied his request and offered an ice pack instead. (*Id.*) Brown further stated that when he was later seen by a doctor, he was given the wrong medicine, which resulted in him being flown to Las Vegas for two surgeries. (*Id.* at 4.) Brown explained he was still in pain and had problems with his hand due to ESP staff's unwillingness to provide prompt treatment when he requested a man down. (*Id.*)

On January 8, 2024, Brown submitted a kite to his caseworker following up on his Informal Grievance:

> I filed an Informal Grievance to HDSP about an incident that occurred while I was at ESP. I want to know if the grievance would follow me here or do I have to refile it. If it follows me what is the process because I turned it in . . . 12/10/23 and still haven't received a response.

(ECF No. 41 at 11.) Brown's caseworker informed him it would be processed at HDSP and sent to ESP once they were done. (*Id.*) Approximately two weeks later, Brown submitted another kite to his caseworker asking for clarification about the timeframe for a response:

> . . . I was transferred back to ESP before I could receive a response. The 45 day response time limit is approaching, but AR 740.08(12)(B) states "timeframes do not apply" if the incarcerated person has been transferred. So I want to know do I still proceed to the First Level.

(*Id.* at 12.) Brown's caseworker stated she needed more information about the grievance. (*Id.*)

On January 24, Brown submitted a kite in response questioning why his

caseworker needed information about the substance of his grievance when he was asking about the proper procedure. (*Id.* at 13.) Brown reiterated that all he wanted to know was whether he should proceed to the First Level if he did not receive a response by the 45 day deadline. (*Id.*) Brown's caseworker recommended that he contact HDSP because she "[did] not see a grievance for that date in question." (*Id.*) She also told him that it was "not surprising" he had not received a response because "dates do not apply when you have transferred." (*Id.*)

On January 28, Brown filed a First Level Grievance informing prison officials that it had been 45 days and he had not received a response to his Informal Grievance. (ECF No. 35-3 at 28.) Brown also recounted the details of the underlying grievance. (*Id.* at 29 30.) Brown's First Level Grievance was rejected on February 6: "Per AR 740. When offenders are transferred to other institutions time frames on grievance do not apply. Offender must wait for response before moving onto the next level." (*Id.* at 27.)

On April 1, nearly two months later, Brown filed a Second Level Grievance. (*Id.* at 13.) Brown stated it was "for exhaustion purposes as a good faith act for coordinator to redress or correct wrongful doing." (*Id.*) Brown reiterated that he had still not received a response to his Informal Grievance despite almost four months having passed. (*Id.*) Brown also explained that he had attempted to seek redress at the First Level but was rejected. (*Id.* at 14.) Brown's Second Level Grievance was also rejected: "Offenders may not go to the next level after a rejection occurred. Resubmit a level 1." (*Id.* at 11.) No further grievances were submitted. (*See* ECF No. 35-4 at 9.)

Brown's grievance history report, which was generated a full year after Brown submitted his Informal Grievance, shows neither ESP nor HDSP staff ever responded to his Informal Grievance. (*See id.*) There is no evidence in the record indicating Brown's Informal Grievance was ever responded to.

//

## II. Legal Standard

### a. Review of Reports and Recommendations

Under the Federal Magistrates Act, a court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by [a] magistrate judge." 28 U.S.C. § 636(b)(1). Where a party timely objects to a magistrate judge's report and recommendation, then the court is required to "make a *de novo* determination of those portions of the [report and recommendation] to which objection is made." 28 U.S.C. § 636(b)(1). A court is not required to conduct "any review at all . . . of any issue that is not the subject of an objection." *Thomas v. Arn*, 474 U.S. 140, 149 (1985). Garcia filed an objection to Judge Baldwin's R&R arguing that Brown did not properly exhaust his claims under the Prison Litigation Reform Act ("PLRA") and that she entitled to qualified immunity. (ECF No. 53.) As such, the Court reviews the issues named in the objection *de novo.*

### b. Summary Judgment

The Federal Rules of Civil Procedure provide for summary adjudication when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting or disputing a fact "must support the assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Material facts are those that may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is a sufficient evidentiary basis on which a reasonable fact-finder could rely to find for the nonmoving party. *Id.*

In determining summary judgment, courts apply a burden-shifting

analysis. A party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When the nonmovant bears the burden at trial, as is the case here, the movant can meet its burden by either (1) presenting evidence to negate an essential element of the nonparty's case; or (2) by demonstrating that the non-moving party failed to make a showing sufficient to establish an element essential to that party's case, and on which the non-movant will bear the burden of proof at trial. *See id.* at 323-24. After the movant has met its burden, the burden shifts to the nonmovant to come forward with specific facts showing a genuine issue of material fact remains for trial. *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although "[o]n summary judgment the inferences to be drawn from the underlying facts...must be viewed in the light most favorable to the party opposing the motion," *id.* (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)), the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586-87 (internal citations omitted). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Anderson*, 477 U.S. at 252. In other words, the non-moving party cannot avoid summary judgment by "relying solely on conclusory allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citing *Angel v. Seattle-First Nat. Bank*, 653 F.2d 1293, 1299 (9th Cir. 1981)). Instead, to survive summary judgment, the opposition must go beyond the assertions and allegations of the pleadings and set forth specific facts by producing admissible evidence that shows a genuine issue for trial. *See Celotex*, 477 U.S. at 324.

## III. Analysis

### a. Administrative Exhaustion Under the PLRA

Garcia argues that the R&R incorrectly concluded that Brown exhausted

his administrative remedies under the PLRA because it failed to account for a piece of evidence indicating that Brown was instructed to refile his Level 1 grievance and chose not to do so. (ECF No. 53 at 4-5.) According to Garcia, this shows that exhaustion was not futile because Brown failed to pursue a possible administrative remedy. (*Id.* at 5.)

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The PLRA requires "proper exhaustion" of an inmate's claims. *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). This means that "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 88. An inmate need exhaust only such administrative remedies as are "available." *Ross v. Blake*, 578 U.S. 632, 648 (2016); *see e.g., Eaton v. Blewett*, 50 F.4th 1240, 1245 (9th Cir. 2022).

The Supreme Court has recognized at least three ways in which an administrative remedy is unavailable: (1) "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) if it is "so opaque that it becomes, practically speaking, incapable of use"; and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 633. In the third instance, a grievance procedure is unavailable when "the correctional facility's staff misled the inmate as to the existence or rules of the grievance process," misled the inmate "into thinking that … he had done all he needed to initiate the grievance process" or "play[s] hide-and-seek with administrative remedies." *Id.* at 644 n.3 (citations omitted). "When prison officials

improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies." *Andres v. Marshall*, 867 F.3d 1076, 1079 (9th Cir. 2017). And "[d]elay in responding to a grievance . . . may demonstrate that no administrative process is in fact available." *Brown v. Valoff*, 422 F.3d 926, 943 n.18 (9th Cir. 2005).

The failure to exhaust administrative remedies is "'an affirmative defense the defendant must plead and prove.'" *Albino v. Baca*, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting *Jones v. Bock*, 549 U.S. 199, 204, 216 (2007)). To determine if a defendant has proved a failure to exhaust under the PLRA, the court applies a burden-shifting framework. *Williams v. Paramo*, 775 F.3d 1182, 1191 (citing *Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996)). The "defendant must prove that there is an available administrative remedy, and that the prisoner did not exhaust that available remedy." *Id.* (citations omitted). "Then, the burden shifts to the plaintiff, who must show that there is something particular in his case that made the existing and generally available administrative remedies effectively unavailable" because they were "ineffective, unobtainable, unduly prolonged, inadequate, or obviously futile." *Id.* (quoting *Albino*, 747 F.3d at 1172 (citing *Hilao*, 103 F.3d at 778 n.5 (9th Cir. 1996))).

Examining the grievance record, the Court finds that the proper exhaustion procedure was unavailable to Brown. Brown filed his informal grievance on December 10, 2023. (ECF No. 35-3 at 2.) Forty-nine days later, on January 28, 2024, Brown had not received a response and filed a first level grievance. (ECF No. 35-4 at 9.) On February 6, 2024, he was told that because he was transferred from HDSP to ESP, the AR 740 timeline did not apply and he would need to wait for a response. (*Id.*) Sixty-four days later, on April 1, 2024, Brown had still not received a response to his grievance on the merits and attempted to file a second level grievance. (*Id*; ECF No. 35-3 at 12.) On April 5, 2024, nearly four months

after his initial informal grievance, Brown received a response that his submission was improper because "offenders may not go to the next level after a rejection occurred. Resubmit a level 1." (ECF No. 35-3 at 11.) Brown filed this lawsuit on May 14, 2024, having never received a response to his initial grievance. (ECF No. 41 at 5.)

Garcia's argument that Brown somehow failed to engage in the process by not refiling his level 1 grievance is unavailing. In this case, a substantive response to Brown's grievance was already delayed four months. Brown diligently pursued relief through the second-level grievance stage and submitting kites requesting more information. *See Nunez v. Duncan*, 591 F.3d 1217, 1224 (9th Cir. 2010) (failure to exhaust excused where plaintiff took "reasonable and appropriate steps" to exhaust his claims and was precluded from doing so). Although Brown was told to resubmit his grievance at an earlier level, he had already been told that he would have to wait indefinitely for a response given his prison transfer. The Ninth Circuit explicitly "refuse[s] to interpret the PLRA so narrowly as to . . . permit prison officials to exploit the exhaustion requirement through indefinite delay in responding to grievances." *Brown*, 422 F.3d at 943 n. 18 (quoting *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002)). There is a genuine dispute of fact whether prison officials created a procedure that operated as a "dead end" or thwarted the use of the process.

The Court therefore agrees with Judge Baldwin's findings that administrative exhaustion under the PLRA was unavailable to Brown.

**b. Qualified Immunity**

Garcia also disputes the R&R's conclusion on both prongs of the qualified immunity analysis arguing first, that it incorrectly concluded that there was a constitutional violation, and second, that it described the clearly established right at too high a level of generality. (ECF No. 53 at 6-7.)

"The doctrine of qualified immunity protects government officials from

liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). "In § 1983 actions, qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020) (citations and internal quotation marks omitted).

The Supreme Court has set forth a two-part analysis for resolving government officials' qualified immunity claims. See *Saucier v. Katz*, 533 U.S. 194, 201 (2001), overruled in part on other grounds by *Pearson v. Callahan,* 555 U.S. 223, 236 (2009). Under this analysis, "[q]ualified immunity protects government officials from liability under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." *Cuevas v. City of Tulare*, 107 F.4th 894, 898 (9th Cir. 2024) (citation and internal quotation marks omitted). First, the court considers whether the facts "[t]aken in the light most favorable to the party asserting the injury ... show [that] the [defendant's] conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201. Second, the court must determine whether the right was clearly established at the time of the alleged violation. *Id.* Courts exercise "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822 (2015) (per curiam). "[A] court must define the right at issue with 'specificity' and 'not ... at a high level of generality.'" *Gordon v. County of Orange*, 6 F.4th 961, 968 (9th Cir. 2021) (quoting *City of Escondido*

*v. Emmons*, 586 U.S. 38, 42 (2019) (per curiam)). "A constitutional right is clearly established if every reasonable official would have understood that what he is doing violates that right at the time of his conduct." *Sampson v. County of Los Angeles by & through L.A. Cnty. Dep't of Child. & Fam. Servs.*, 974 F.3d 1012, 1018–19 (9th Cir. 2020) (citation and internal quotation marks omitted).

To conclude that the right is clearly established, the court need not identify an identical prior action. *See Anderson v. Creighton*, 483 U.S. 635, 640 (1987). However, "existing precedent must have placed the statutory or constitutional question beyond debate." *Foster v. City of Indio*, 908 F.3d 1204, 1210 (9th Cir. 2018) (per curiam) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (per curiam)).

Although both the "clearly established right" and "reasonableness" inquiries are questions of law, where there are factual disputes as to the parties' conduct or motives, the case cannot be resolved at summary judgment on qualified immunity grounds. *See Rosenbaum v. City of San Jose*, 107 F.4th 919, 924 (9th Cir. 2024) ("Where factual disputes exist as to the objective reasonableness of an officer's conduct, the case cannot be resolved at summary judgment on qualified immunity grounds." (citation omitted)); *Torres v. City of Madera*, 648 F.3d 1119, 1123 (9th Cir. 2011) ("Where the objective reasonableness of an officer's conduct turns on disputed issues of material fact, it is a question of fact best resolved by a jury ...; only in the absence of material disputes is it a pure question of law." (citations and internal quotation marks omitted)).

i. **Constitutional Right**

Garcia argues that she did not act with deliberate indifference to Brown's medical needs because Brown's theory of the case is blatantly contradicted by the record, and that Brown failed to prove that offering an ice pack to treat his swelling hand was medically unacceptable under the circumstances. Brown

points to evidence that Garcia's giving him an ice pack amounted to an unreasonable denial or delay of treatment for his serious medical need.

The government has an "obligation to provide medical care for those whom it is punishing by incarceration," and failure to meet that obligation can constitute an Eighth Amendment violation cognizable under § 1983. *Estelle v. Gamble*, 429 U.S. 97, 103–05 (1976). In order to prevail on an Eighth Amendment claim for inadequate medical care, a plaintiff must show "deliberate indifference" to "serious medical needs." *Id.* at 104. This includes "both an objective standard—that the deprivation was serious enough to constitute cruel and unusual punishment—and a subjective standard—deliberate indifference." *Snow*, 681 F.3d at 985. Garcia does not dispute that Brown met the objective prong by demonstrating that he had a serious medical need, so the Court will not address it. She focuses entirely on the care that she provided to Brown over the course of his injury.

To satisfy the subjective standard of the second prong, a plaintiff must show "(a) purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). Delay of, or interference with, medical treatment can amount to deliberate indifference. *Id*; *Clement v. Gomez*, 298 F.3d 898, 905 (9th Cir. 2002); *Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002); *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000); *Hutchinson v. United States*, 838 F.2d 390, 394 (9th Cir. 1988). Where the prisoner is alleging that delay of medical treatment evinces deliberate indifference, the prisoner must show that the delay led to further injury. *See Hallett*, 296 F.3d at 745–46; *Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985) (per curiam).

At issue here is the first prong of the subjective test: whether Garcia failed to respond to Brown's pain or possible medical need. The R&R concluded that Brown adduced sufficient evidence to satisfy the first prong because, viewing the

facts in the light most favorable to Brown, Garcia knew that Brown wanted to call a man down, that he was in pain, and his hand was oozing pus. Despite this, Garcia failed to respond to his medical need, refused his request, and offered only an ice pack. This caused Brown to need more serious medical treatment just 24 hours later.

Garcia argues that Brown's medical records "directly contradict" Brown's theory of the case, citing *Scott v. Harris*, 550 U.S. 372, 380 (2007). (ECF No. 53 at 7.) At the motion for summary judgment stage, the facts are viewed in the light most favorable to the non-moving party. *Matsushita Electric Indus. Co.*, 475 U.S. at 587-88. Brown alleges that on September 11, 2023, he sought a "man down" in order to receive emergency medical attention for an infected injury that was oozing pus on his left hand. (ECF No. 11 at 5.) Garcia did not provide Brown emergency medical attention, instead giving him an ice pack. (*Id.* at 13, 15.) The medical records that Garcia cites state the same thing: on September 11, Brown wanted to be immediately seen by a doctor, and Garcia "offered ice to help with swelling" instead. (ECF No. 37-1 at 14.) The medical records suggests that Garcia told Brown to keep his wound "clean," but does not contradict the severity of the injury oozing pus. (*Id.*) Therefore, the Court finds that Brown's version of facts is not blatantly contradicted by the record.

Turning to whether Garcia was deliberately indifferent under the subjective element of the test, Garcia argues that Brown cannot prove his case because Garcia provided some care to Brown. (ECF No. 53 at 7.) Garcia argues that at most, the decision to provide an ice pack was a disagreement as to the course of treatment, and in the alternative, Brown has not offered a medical expert to demonstrate that offering an ice pack was medically unacceptable. (ECF No. 53 at 8.)

This case is about delay or denial of care, not whether Garcia providing Brown an ice pack was medically acceptable under the circumstances. The Court

finds that Brown has presented sufficient evidence to create genuine dispute as to subjective deliberate indifference for denying or delaying Brown's emergency care. It is undisputed that Brown had a serious medical need, namely, an infection in his hand that was serious enough to require that he be flown to a hospital for emergency care, where he was treated for more than a month. That emergency evacuation and care occurred less than 24 hours after Garcia offered Brown an ice pack. (ECF Nos. 35 at 3; 35-2 at 2, 41 at 3-4.) Brown argues that the emergency airlift would not have been necessary absent the delay. (ECF No. 11 at 17.) The Ninth Circuit has held intentional delays in providing care can constitute deliberate indifference. *See Clement*, 298 F.3d at 905 (stating that prison officials violate the Eighth Amendment by intentionally denying or delaying access to medical care); *Russell v. Lumitap*, 31 F.4th 729, 741 (9th Cir. 2022) (same). In *Clement*, the court held a four-hour delay in providing showers and medical attention to inmates who had been suffering the harmful effects of pepper spray vapors could constitute deliberate indifference. 298 F.3d at 905. In *Russell*, the court held that a delay of several hours where the plaintiff was displaying symptoms of a heart attack could constitute deliberate indifference. 31 F.4th at 743. Viewing the facts in the light most favorable to Brown, a reasonable jury could find that where Brown requested emergency medical care and had an objectively severe condition that denying that care and simply providing an ice pack could constitute deliberate indifference.

ii. **Clearly Established Right**

Finally, Garcia argues that the R&R defined the clearly established right at too high a level of generality. The R&R found that "a prison official who is aware that an inmate is suffering an acute medical condition violates the Constitution when he stands idly by rather than responding with reasonable diligence to treat the condition." *Sandoval v. County of San Diego*, 985 F.3d 657, 671 (9th Cir. 2021). Garcia argues that this standard does not offer guidance on the amount

of care required under the law, and regardless, she did not stand "idly by" when she offered Brown an ice pack for his infected hand. (ECF No. 53 at 7.) Garcia instead offers that Brown did not have a clearly established right "that a nurse or medical provider must do everything within their power to have a positive medical outcome for a patient." (ECF No. 35 at 17.)

"[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances–i.e., even without a prior case that had fundamentally similar or materially similar facts." *Sandoval*, 985 F.3d at 680 (citing *Wilk v. Neven*, 956 F.3d 1143, 1148 (9th Cir. 2020)) (internal quotations omitted). The Ninth Circuit has repeatedly rejected qualified immunity in such cases merely because there is no "case on all fours with the factual context presented here." *Stewart v. Aranas*, 32 F.4th 1192, 1195-96 (9th Cir. 2022); *D'Braunstein v. California Highway Patrol*, 131 F.4th 764, 773 (9th Cir. 2025).

Although there is not a case that precisely establishes whether Garcia's choice to deny Brown's request for emergency care was reasonably diligent under the law, the Court agrees with the R&R that a reasonable nurse, knowing what Garcia knew, would have understood that denying or delaying care to a patient with an infected hand could violate the Constitution. In *Sandoval*, the Court found that Nurse de Guzman's choice to perform a 10-second blood sugar test in light of information that the patient was facing a substantial risk of serious harm amounted to "minimal—almost non-existent" treatment in violation of the Constitution. *Sandoval*, 985 F.3d at 679. While the nurse in *Sandoval* did something, the court found that he was not entitled to qualified immunity based on case law requiring that prison nurses respond to serious medical needs with reasonable diligence. That same clearly established rule applies here. Garcia is not entitled to qualified immunity because every reasonable nurse in her position would have understood that merely treating Brown's infected hand with an ice

pack could violate the Constitution.

**IV. Conclusion**

It is therefore ordered that Defendant's objections to the R&R (ECF No. 53) are OVERRULED.

It is further ordered that Judge Baldwin's R&R (ECF No. 46) is adopted in full.

It is further ordered that Defendant's Motion for Summary Judgment (ECF No. 35) is DENIED.

Dated this 30th day of July, 2026.

ANNE R. TRAUM
UNITED STATES DISTRICT JUDGE